**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ANDREW DILL, DMD, AMY VARBLE, DMD, AND MICHAEL WONG, DMD, P.C., on behalf of itself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| CONTINENTAL WESTERN GROUP, LLC, | ) ) | |
| TRI-STATE INSURANCE COMPANY OF MINNESOTA | ) ) ) | |
| and | ) ) | |
| W.R. BERKLEY CORPORATION | ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**<u>PLAINTIFF'S CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ........................................................................................ 1

II.  THE PARTIES ......................................................................................................... 3

Plaintiff ........................................................................................................................ 3

Defendants ................................................................................................................... 3

III. FACTUAL ALLEGATIONS ..................................................................................... 9

A.  The Global COVID-19 Pandemic ........................................................................... 9

B.  Steps Taken by Authorities in Missouri to Control the Pandemic .................................. 11

C.  Standards and Recommendations Related to the Pandemic for Dental Practices ........... 13

D.  The Devastating Impact of the COVID-19 Pandemic on Dental Practices ..................... 17

E.  Plaintiff's Business Owner's Insurance Policies with Defendants .................................. 19

1. Defendants' attempts on their websites to discourage claims ............................................. 24

2. W.R. Berkley's denial of coverage in its financial statements ........................................... 27

3. Defendants' Denial of Plaintiff's claim ............................................................................. 29

IV. CLASS ALLEGATIONS ........................................................................................... 34

V.  JURY DEMAND ....................................................................................................... 37

COUNT I: Business Income Breach Of Contract ................................................................ 37

COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to
      Business Income ........................................................................................................ 38

COUNT III: Declaratory Relief Applicable to Business Income ............................................ 40

COUNT IV: Extra Expense Breach of Contract ................................................................... 41

COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to

  Extra Expense ........................................................................................................... 42

COUNT VI: Declaratory Relief Applicable to Extra Expense ................................................ 44

PRAYER FOR RELIEF ........................................................................................................... 45

PLAINTIFF ANDREW DILL, DMD, AMY VARBLE, DMD, AND MICHAEL
WONG, DMD, P.C. ("Plaintiff"), individually and on behalf of other similarly situated persons
and entities operating dental practices in Missouri, makes the following allegations based upon
information and belief, except as to those allegations specifically pertaining to Plaintiff, which
are based on personal knowledge. Plaintiff brings this action for breach of contract, breach of the
covenant of good faith and fair dealing, and declaratory and injunctive relief against
DEFENDANTS CONTINENTAL WESTERN GROUP, LLC ("CWG"), TRI-STATE
INSURANCE COMPANY OF MINNESOTA ("Tri-State"), and W.R. BERKLEY
CORPORATION ("W.R. Berkley") (collectively "Defendants"), demanding a trial by jury.

## I.    NATURE OF THE ACTION

1.    Plaintiff is a dental practice offering pediatric dental services in the St. Louis area. To
make sure that it would be protected if it were forced to temporarily cease its practice because of
unanticipated events beyond its control, it purchased a business insurance policy from
Defendants.

2.    Such an event, namely the worst health crisis to hit the State of Missouri, the United
States, and indeed the world in over a century, arrived in early 2020 in the form of a worldwide
pandemic of a disease called COVID-19, causing a massive number of illnesses and numerous
deaths.

3.    Like Plaintiff, many other dental practices purchased insurance from Defendants to
protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic.
These policies promise to indemnify the policyholder for actual business losses incurred when
business operations are involuntarily suspended, interrupted, or curtailed because of direct
physical loss of its property. This coverage is commonly known as "business interruption" or
"business income" coverage.

1

4.   Insurance is a way to manage risk, providing protection from financial loss. It is particularly appropriate – indeed, vital – for protection against losses that, while unlikely to occur, would be financially devastating if they do occur.

5.   The COVID-19 pandemic is the epitome of the unexpected catastrophic event – especially for dentists. As a result, beginning in mid-late March, the CDC and dentists' professional organizations urged dental offices to postpone elective, or non-urgent procedures and essentially shut down.

6.   For approximately six weeks, in response to these recommendations and because of the risk of continuing its dental practice during the pandemic, Plaintiff shut down its practice except for a few emergency patients. Even after re-opening, the pandemic has severely limited the number of patients it can see and has increased the expenses needed to run its practice.

7.   According to surveys by the American Dental Association, all other Missouri dental practices also ceased seeing patients for elective or non-urgent visits for the same reasons.

8.   However, despite the provision of business income coverage in its policies, Defendants are publicly refusing to comply with their obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their insured property arising from the COVID-19 pandemic.

9.   Defendant W.R. Berkley's CEO, none other than Mr. W.R. Berkley himself, publicly stated that the company's policies did not cover business losses due to the pandemic; he even accused lawyers for insureds of trying to take advantage of the catastrophe. He stated that they "seem to subscribe to the unfortunate idea of never letting a crisis go to waste."[1]

---

[1] Edited Transcript of Q1 2020 W.R. Berkley Corp. Earnings Call, April 21, 2020, available on Defendant Berkley's website at https://ir.berkley.com/home/default.aspx (accessed 5/29/2020) (emphasis added).

10. However, dentists' losses due to the pandemic are not imagined. Plaintiff therefore brings this action on behalf of itself and classes and subclasses of dental practices (as defined below) that (a) purchased standard commercial property insurance policies from Defendants that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics and (b) have suffered business income and extra expense losses.

11. This action also seeks a declaratory judgment that Defendants are contractually obligated to pay these losses. In addition, Plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Defendants' breach of contract and wrongful conduct alleged herein.

## II.  THE PARTIES

### Plaintiff

12. Plaintiff is a professional corporation organized under the laws of the State of Missouri that until March 2020 operated a four-person pediatric dental practice in St. Louis Missouri consisting of Drs. Andrew Dill, Amy Varble and Michael Wong, as well as an associate dentist, Dr. Murray Appelbaum. Because of the pandemic, it shut down from March 17, 2020, and Dr. Appelbaum retired. Plaintiff re-opened with a partial day on May 1. Then during the entire month of May it operated on a limited schedule because of the need for social distancing. Its practice is still not back to normal as a result of the pandemic.

### Defendants

13. CWG is an insurance company formed under the laws of Delaware with a registered agent in Clayton, MO, operating out of P.O. Box 1594, Des Moines, IA 50306-1594. It is licensed by the Missouri Department of Insurance. In Missouri in 2019, it received $9.5 million in premiums on Total Property & Casualty insurance while incurring only $1.5 million in losses

3

on such insurance. That same year in Missouri it received $5.0 million in premiums on

Commercial Multi-Peril insurance while incurring only $0.9 million in losses on such insurance.[2]

14. CWG tells consumers that W.R. Berkley benefits them: "Our local knowledge and

expertise is combined with the global strength of Berkley. Continental Western Group® is a

member company of Berkley, the worldwide insurance and reinsurance operations of W. R.

Berkley Corporation and a leading provider of commercial lines property and casualty insurance

and reinsurance. The insurance company members of Berkley are rated A+ (Superior) by A.M.

Best Company and A+ (Strong), by S&P."[3] It also says: "Our local knowledge and expertise,

combined with the global strength of the W. R. Berkley companies, provide you with tailored

insurance solutions."[4]

15. Tri-State is a corporation incorporated in Iowa and licensed by the Missouri Department

of Insurance with the same Post Office Box number and phone number as CWG. In Missouri in

2019, it received $5.2 million in premiums on Total Property & Casualty insurance while

incurring only $3.7 million in losses on such insurance. That same year in Missouri it received

$2.1 million in premiums on Commercial Multi-Peril insurance while incurring only $1.4 million

in losses on such insurance.[5]

16. W.R. Berkley is incorporated in Delaware and has its principal place of business at 475

Steamboat Road, Greenwich, CT, 06830.[6] As it states on its website, it is an insurance provider,

including insurance that it sells through CWG: "We provide insurance solutions through more

---

[2] https://insurance.mo.gov/CompanyAgentSearch/CompanySearch/compSearchDetails.php?id=126092&t=
CM&n=CONTINENTAL+WESTERN+INSURANCE+COMPANY&c= (accessed 7/15/2020).
[3] https://www.cwgins.com/about-cwg/ (accessed 7/25/2020).
[4] *Id.*
[5] https://insurance.mo.gov/CompanyAgentSearch/CompanySearch/compSearchDetails.php?id=125644&t
=CC&n=TRI%20STATE%20INSURANCE%20COMPANY%20OF%20MINNESOTA (accessed 7/25/2020).
[6] W.R. Berkley Corporation SEC Form 10-K for year ended 12/31/2019.

than 50 Berkley companies - each with deep expertise in an industry, product line, or geographic niche."[7]



17. As shown below, Plaintiff's policies with CWG indicate that W.R. Berkley stands behind CWG's ability to pay claims.

18. W.R. Berkley is a holding company but, according to what it tells the public, it is more than a passive holding company. W.R. Berkley states that it writes commercial lines. According to the Insurance Information Institute, "commercial lines" is a term used to describe insurance products designed for businesses.[8] To "write" insurance means to insure and/or to underwrite (guarantee payment in case loss occurs):[9] W.R. Berkley boasts that it is among the largest writers of commercial lines in the country.[10]

---

[7] https://www.berkley.com/ (accessed 6/27/2020)
[8] https://www.iii.org/fact-statistic/facts-statistics-commercial-lines (accessed 7/31/2020)
[9] https://www.irmi.com/term/insurance-definitions/write;
https://www.lexico.com/en/definition/underwrite(both accessed 7/31/2020).
[10] https://www.berkley.com/about-us (accessed 7/31/2020).



## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of the class; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

20. The facts set forth in this Complaint show that this Court has personal jurisdiction over Defendants. In fact, W.R. Berkley aims its insurance marketing efforts directly at Missouri consumers. On its website, it has a feature that allows customers to search for the appropriate Berkley unit, including by state. The screenshot below, captured on a computer in St. Louis County, shows how that feature allows customers to search for primary commercial multi-peril insurance in Missouri:[11]

---

[11] https://www.berkley.com/locator/ (accessed 7/24/2020).

6



21. The screenshot below, also captured from St. Louis County, shows a partial result of the above search, with Continental Western Group as the second option listed, along with a Contact button allowing the customer to contact CWG (for some reason Tri-State is not shown):[12]

---

[12] https://www.berkley.com/locator/ (accessed 7/24/2020).



22. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

## III. FACTUAL ALLEGATIONS

### A.  The Global COVID-19 Pandemic

23. According to the World Health Organization ("WHO") COVID-19 is an infectious disease for which there is no vaccine or treatment.[13] It spreads easily from person-to-person.[14]

24. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[15] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[16]

25.  Thus, absent testing, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

26. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[17]

27. The coronavirus can also infect people who touch surfaces, such as countertops, doorknobs – and, of course, dental equipment – that contain the virus. It can live on plastic and stainless steel for up to three days.[18]

28. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[19] The disease did not even have an official name when WHO declared a "Public Health Emergency of International

---

[13] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 5/10/2020).
[14] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).
[15] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).

9

Concern" on January 30, 2020.[20] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019."[21]

29. After it was first discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[22]

30. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[23] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[24]

31. At the point that WHO labeled COVID-19 a pandemic, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[25]

32. According to the COVID Tracking Project, 1,672 patients at that point had tested positive in the United States, and 43 patients had died.[26] From March 11 on, the number of cases and deaths increased rapidly. By March 23, 2020, the number of cases in this country had increased more than 28 times to 47,013 and deaths had increased by 12 times to 521.

33. As of July 31, 2020, according to the *New York Times*, 4.5 million Americans had tested positive for COVID-19, and 153,000 have died from the disease.[27] That was more than any other

---

[20] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[21] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[22] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[23] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[24] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).
[25] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[26] https://covidtracking.com/data/us-daily (accessed 5/13/2020).
[27] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7/31/2020).

country in the world and the 8th and 10th[th] highest on a per capita basis in those two metrics, respectively.[28]

34. Missouri was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths. But by April 3, when Gov. Parson issued his "Stay at Home" Order, positive tests had skyrocketed to 2,113 and 19 Missourians had died of the disease. As of July 31, there had been 50,041 cases, and 1,291 COVID-19 deaths in Missouri.[29]

35. The rate of infection in St. Louis City and County quickly caught up with, and in some metrics surpassed the rest of the country. As of July 31, 2020, per 100,000 residents in the City and County respectively, there were 1,4068and 1,296 cases and 56 and 65 deaths[30]; that compares to 1,386 cases and 47 deaths per 100,000 in the United States as a whole.[31]

**B. Steps Taken by Authorities in Missouri to Control the Pandemic**

36. On March 13, 2020, a state of emergency presented by COVID-19 was declared in both St. Louis City and St. Louis County.[32]

37. As COVID-19 continued to spread, the City and County of St. Louis both issued Stay at Home Orders.

38. On March 21, 2020, County Executive Dr. Sam Page issued an Executive Order, commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, *inter alia*, to "perform tasks essential

---

[28] *Id*.
[29] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 7/31/2020).
[30] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 7/30/2020).
[31] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7/27/2020).
[32] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/covid-19-public-health-emergency-order-and-proclamation.cfm; and https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (both accessed 5/11/2020).

to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital …."[33]

39. On March 23, 2020, the St. Louis County Director of Public Health issued a Stay at Home Order and, subsequently an Amended Stay at Home Order, that allowed residents to leave home to engage in "Essential Activities," including "Healthcare Operations," defined to include dentists. The Order was scheduled to remain in place until 11:59 April 22, 2020.[34]

40. That Order was amended on April 23, 2020, and again on May 4, 2020, extending the Stay at Home Order indefinitely.[35] On May 8, 2020, the St. Louis County Director of Public Health eased the restrictions somewhat as of May 8, 2020, but still noted: "All Gatherings pose an increased risk of transmission and should be voluntarily avoided whenever possible."[36]

41. Meanwhile, the City of St. Louis issued a Stay at Home Order that, as in St. Louis County, went into effect March 23. It ordered all individuals living in the City to remain at home with certain exceptions including "[t]o perform tasks essential to the health and safety of individuals, their family [and] household members … such as … visiting a health care professional."[37] That order was extended on April 16, 2020, with no definite ending date.[38] On

---

[33] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 5/11/2020).
[34] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/; https://stlouisco.com/portals/8/docs/document%20library/CountyExecutive/Executive%20Orders/Stay%20at%20Home%20Order.pdf (both accessed 5/11/2020).
[35] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/; https://stlcorona.com/news/dph-covid-19-update-542020/ (both accessed 5/11/2020.
[36] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 5/13/2020).
[37] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 5/11/2020).
[38] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commissioner-s-Order-No-7.pdf (accessed 5/11/2020).

May 11, 2020, the City Health Commissioner entered an order similar to that in St. Louis County, allowing limited re-opening as of May 18.[39]

### C. Standards and Recommendations Related to the Pandemic for Dental Practices

42. Even before the Stay at Home Orders went into effect, authorities were recommending that dental practices close.

43. On March 16, the ADA recommended that dental practices "halt day-to-day non-emergency procedures."[40] On that date, ADA President Chad P. Gehani stated: "[T]he ADA recommends dentists nationwide postpone elective procedures for the next three weeks."[41]

44. On March 18, CDC urged all dentists to cancel, or at least postpone, all elective and non-urgent dental visits.[42]

45. The CDC explained that these recommendations were based on the risk of infection in dental offices, especially because of the spatter of bodily fluids and microorganisms:

> The practice of dentistry involves the use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes. These instruments create a visible spray that contains large particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, dental health care personnel (DHCP), or the patient. The spray also might contain certain aerosols.[43]

46. CDC went on to explain that the precautions it recommended in other healthcare settings were not possible for dental practices because dental settings "are not designed for or equipped to provide this standard of care. For example, most dental settings do not have airborne infection

---

[39] https://www.stlouis-mo.gov/government/departments/mayor/news/city-of-st-louis-to-begin-gradually-reopening-on-may-18.cfm (accessed 5/13/2020).
[40] https://www.dentalproductsreport.com/view/ada-isds-announce-recommendations-practices-close-due-coronavirus (accessed 7/17/2020).
[41] *Id*.
[42] https://aonaffinity-blob-cdn.azureedge.net/affinitytemplate-dev/media/dentistsadvantagedev/media/risk/alerts/rmalert_coronavirus_march2020.pdf (accessed 7/17/2020).
[43] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020) (footnote omitted).

isolation rooms or single-patient rooms, do not have a respiratory protection program, and do not routinely stock N95 respirators."[44]

47. Accordingly, CDC recommended that "[s]ervices should be limited to urgent and emergency visits only during this period of the pandemic. These actions help staff and patients stay safe, preserve personal protective equipment and patient care supplies, and expand available health system capacity."[45]

48. On March 23, 2020, the Missouri Dental Board, the body that regulates Missouri dentists, issued a bulletin stating that it supports the CDC and ADA recommendations described above, and it "urged Missouri dentists to adhere to them." The Board also "strongly encouraged" dentists "to take the necessary steps to insure the safety of their patients, staff and themselves by limiting opportunities for this virus to continue to spread."[46]

49. The ADA issued updated guidance on March 31, 2020, as to what constitutes emergency or non-urgent procedures.[47] It stated:

> Dental emergencies are potentially life threatening and require immediate treatment to stop ongoing tissue bleeding, alleviate severe pain or infection, and include: • Uncontrolled bleeding • Cellulitis or a diffuse soft tissue bacterial infection with intra-oral or extra-oral swelling that potentially compromise the patient's airway • Trauma involving facial bones, potentially compromising the patient's airway.

50. According to the same recommendation:

> Urgent dental care focuses on the management of conditions that require immediate attention to relieve severe pain and/or risk of infection and to alleviate the burden on hospital emergency departments. These should be treated as minimally invasively as possible. • Severe dental pain from pulpal inflammation • Pericoronitis or third-molar pain • Surgical post-operative osteitis, dry socket dressing changes • Abscess, or localized bacterial infection resulting in localized

---

[44] https://web.archive.org/web/20200327164143/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/11/2020).
[45] *Id.*
[46] https://content.govdelivery.com/accounts/MODIFP/bulletins/282c1ac (accessed 5/11/2020).
[47] https://success.ada.org/~/media/CPS/Files/Open%20Files/ADA_COVID19_Dental_Emergency_DDS.pdf (accessed 7/27/2020).

pain and swelling • Tooth fracture resulting in pain or causing soft tissue trauma • Dental trauma with avulsion/luxation • Dental treatment required prior to critical medical procedures • Final crown/bridge cementation if the temporary restoration is lost, broken or causing gingival irritation • Biopsy of abnormal tissue.[48]

51. As of mid-May, 2020, the CDC's recommendations were still in effect.[49] When the CDC reiterated them on April 7, 2020, it noted that the United States Occupational Safety and Health Administration had said that dental healthcare professionals were at very high risk of COVID-19 "as their jobs are those with high potential for exposure to known or suspected sources of the virus that causes COVID-19 during specific procedures."[50]

52. CDC did not provide recommendations for resuming non-emergency dental care until May 19, 2020. When it did so it stated: "Dental settings have unique characteristics that warrant specific infection control considerations."[51] Its specific recommendations included:

    a.  Practice universal source control and actively screen for fever and symptoms of COVID-19 for all people who enter the dental facility.

    b.  If patients do not exhibit symptoms consistent with COVID-19, provide dental treatment only after you have assessed the patient and considered both the risk to the patient of deferring care and the risk to DHCP of healthcare-associated disease transmission.

    c.  Ensure that you have the appropriate amount of personal protective equipment (PPE) and supplies to support your patient volume. If PPE and supplies are limited, prioritize dental care for the highest need, most vulnerable patients first.[52]

---

[48] https://success.ada.org/~/media/CPS/Files/Open%20Files/ADA_COVID19_Dental_Emergency_DDS.pdf (accessed 7/27/2020.

[49] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/13/2020).

[50] https://web.archive.org/web/20200414014847/https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 5/1/11/2020).

[51] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 6/22/2020).

[52] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html (accessed 6/22/2020).

53. On April 29, 2020, a COVID-19 task force, part of a joint effort by the Office of the Missouri State Dental Director, the Missouri Dental Association, and the Missouri Primary Care Association, published recommendations for Missouri dentists relating to re-opening and listed May 4 as the "date that has been given for resuming operations in Missouri."[53] However, its guidance included screening staff and patients for COVID-19 symptoms, proper use of personal protective equipment, social distancing practices within offices, and other protective measures to ensure patient safety. *Id*. The task force further stated that dentists should avoid procedures that they are not comfortable performing based on the need to protect their patients and staff. *Id*.

54. This was similar to interim guidance issued by the ADA in April of 2020 regarding the re-opening of dental practices, which called for the "highest level of PPE available – masks, goggles and face shield – to help protect patients and the dental team . . ."[54] Other guidance included calling patients to inquire about their current health status, temperature screening, and social distancing measures. *Id*.

55. Dentists had difficulties re-opening their practices in early-to-mid May because of the unavailability of sufficient PPE. The *St. Louis Post-Dispatch* reported: "Survey data from the American Dental Association suggests that many dentists in Missouri don't have N95s. Of 125 dental practices surveyed in Missouri the week of May 4, roughly a third had zero N95 masks in stock, according to data from the ADA's Health Policy Institute."[55] Moreover, only 27% of the dental practices surveyed said that they had "more than two weeks' worth of N95 masks in stock." *Id*.

---

[53] https://sitefinity.ada.org/docs/librariesprovider30/publications/covid/task-force-guidelines-for-mo-dental-practices_042920.pdf?sfvrsn=2 (accessed 6/22/2020).
[54] https://www.ada.org/en/press-room/news-releases/2020-archives/may/as-dental-practices-resume-operations-ada-offers-continued-guidance (accessed 6/22/2020).
[55] https://www.stltoday.com/business/local/dentists-across-st-louis-searching-for-critical-ppe-needed-to-see-patients/article_bc9c62b3-8279-5888-b4f4-079786fb215b.html (accessed 6/22/2020).

56. Nationwide, during the week of May 18, 53.2% of dentists who were closed except for emergencies stated the reason was an inadequate supply of PPE.[56]

**D. The Devastating Impact of the COVID-19 Pandemic on Dental Practices**

57. In the face of the Covid-19 pandemic, Plaintiff and other Missouri dentists had no choice but to shut down their practices except to see patients for non-elective and urgent care. Any reasonable dentist would have shut down except for such emergencies.

58. And that is what happened.

59. As would be expected, these shutdowns had a terrible economic impact on dentists.

60. On April 15, 2020, Marko Vujicic, Ph. D., chief economist and vice president of the ADA's Health Policy Institute ("HPI"), was quoted as saying that "the coming two to three months represent a critical juncture for the economic sustainability of many dental practices."[57]

61. The ADA has conducted a series of nationwide surveys of dentists beginning the week of March 23, 2020. That week 87% of Missouri dentists' practices were either completely closed or closed except for emergency patients. The remainder were open but seeing fewer patients than usual.[58]

62. That was bad enough, but April was devastating to dentists' practices. By the next survey, the week of April 6, nationally 97% of dentists were seeing no patients at all or only emergency patients, with the remainder seeing a smaller volume than usual. For Missouri, that number was 95% seeing emergency patients at most and the remainder seeing fewer patients

---

[56] https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZWMyYjAzMzYxMWNmMTAwMTBiZWU4NDgtVVJfNWlJWDFFU01IdmNDUlVO (accessed 6/22/20).
[57] https://us.dental-tribune.com/news/dentists-report-financial-impact-of-covid-19-on-their-practices/ (accessed 5/12/2020)
[58] https://surveys.ada.org/results/public/YWRhc3VydmV5cy1VUl81aUlYMUVTTUh2Y0NSVU4tNWU3Y3jg1YTJlOTQ5N2QwMDE2MjdkZmRh?_ga=2.157748348.732403168.1586962644-361293844.1518644424#/pages/Page_e3fd2e25-9bbd-43ce-8252-51794094ac72 (accessed 6/24/2020).

than usual. Eighty percent of Missouri dentists were seeing a patient volume of less than 5% of the typical level, with another 10% at 5-10% of the typical level.[59]

63. The next survey, the week of April 20, was similar. That week again 97% of dentists in the United States were completely shut down except possibly for emergencies; the other few were open but had lower volume than usual.[60]

64. In Missouri that week, 90% were completely closed or seeing only emergency patients, with the rest seeing fewer patients than usual.[61]

65. Not surprisingly, the financial impact on dentists has been terrible. The week of April 20, 76.9% of dentists collected less than 5% in fees compared to what was typical in their practice, and another 13.0% collected between 5 and 10%.[62]

66. Again, Missouri was typical, with 65.7% collecting less than 5% of the typical amount, and another 14.8% collecting between 5-10% during the week of April 20. Only 4.6% collected even 76% or more of what was typical.[63]

67. In addition, dentists have had to incur extra expenses to re-open. Plaintiff has had to buy High Efficiency Air ("HEPA") filters, protective gowns, face shields, seat covers, N95 and KN95 masks, fluid-resistant lab coats, additional and higher level disinfection chemicals and sprays, and plexi-glass barriers, among other things. In addition, its staff has had to spend extra time each day calling and screening patients for virus-like symptoms and it has been unable to treat as many patients because of extra paperwork and disinfection time.

---

[59] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 6 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZThkZDViMDA3YTZhODAwMTAzZTViZTgtVVJfNWlJWDFFU01IdmNDUlVO (accessed 6/24/2020) at 1.

[60] Health Policy Institute, COVID-19: Economic Impact on Dental Practices (Week of April 20 Results), available at https://surveys.ada.org/reports/RC/public/YWRhc3VydmV5cy01ZTlkYjFlMTRlZDkxOTAwMTU4NTU4ZmItVVJfNWlJWDFFU01IdmNDUlVO (accessed 6/24/2020) at 1.

[61] *Id.* at 4.

[62] *Id.* at 6.

[63] Economic Impact at 14.

### E.  Plaintiff's Business Owner's Insurance Policies with Defendants

68. In exchange for premiums paid to its insurers, Plaintiff obtained a Commercial Lines Policy, Policy No.: ADV 3226729 – 20, covering a Policy Period from 6/01/2019 to 6/01/2020 (Exhibit A; "the 2019-20 Policy"), and ADV 3226729 – 21, covering 6/01/20 to 6/01/21 (Exhibit B; "the 2020-2021 Policy") (collectively, "the Policies").

69. The Policies state that they were "[i]ssued by" Tri-State and that CWG is the "insurance provider." Ex. A at 1; Ex. B at 1 (page numbers refer to the page of the pdf file). The Policies don't explain the difference between the issuer and the provider. They also state that CWG's goal is to be "strong" and in describing what that means state: "Our local knowledge and expertise is combined with the global strength of Berkley." *Id.* On information and belief that means that Berkley stands behind CWG's ability to pay claims. Plaintiff's belief is based on the fact that that is a reasonable interpretation and that no other meaning is apparent. Here is how that appears in the 2019-20 Policy:



70. The Commercial Property Declarations of the Policies state that they provide coverage to the limit of "Actual Loss Sustained" with respect to Business Income and Extra Expense at both locations; the Covered Causes of Loss for Business Income are indicated as "SPECIAL." Ex. A at 25; Ex. B at 50.

71. The Location Schedule in each Policy includes Plaintiff's offices where it treats patients. Ex. A at 8; Ex. B at 13. These are the premises described in the Commercial Property Declarations.

72. Under the Policies, Business Income is defined as the:

    a.  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

      b.  Continuing normal operating expenses incurred, including payroll.

Ex. A at 88; Ex. B at 116.

73. The Business Income provision provides coverage for lost Business Income:

> We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'. The 'suspension' must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

Ex. A at 88; Ex. B at 116.

74. The Policies also cover Extended Business Income for losses that occur after the property

is restored, as follows:

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

> > (a) Begins on the date property (except "finished stock') is actually repaired, rebuilt or replaced and 'operations' are resumed; and

> > (b) Ends on the earlier of:

> > > (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

> > > (ii) 60 consecutive days after the date determined in (1)(a) above. However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

> > > Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

Ex. A at 90; Ex. B at 116.

75. "Suspension" means "[t]he slowdown or cessation of your business activities …." Ex. A at 96; Ex. B at 124. That applies to Plaintiff's Business Income losses because, as a result of the COVID-19 pandemic, its business activities slowed down or ceased.

76. "Operations" means "[y]our business activities occurring at the described premises …." Ex. A at 96; Ex. B at 124. That applies to Plaintiff's operations of its restaurant business.

77. For business income coverage, "period of restoration" starts "72 hours after the time of direct physical loss or damage …." Ex. A at 96; Ex. B at 124.

78. The Policies also covers Extra Expense, which is defined as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." Ex. A at 88; Ex. B at 116.

79. For Extra Expense Coverage, "period of restoration" means the period that begins "[i]mmediately after the time of direct physical loss or damage … caused by or resulting from any Covered Cause of Loss at the described premises." Ex. A at 96; Ex. B at 124 (paragraphing omitted).

80. The COVID-19 pandemic caused a direct physical loss of property at Plaintiff's premises at the Scheduled Locations by denying Plaintiff the ability to physically access and use the property in the normal fashion in its business. It is therefore a covered loss.

81. COVID-19 is a "covered cause of loss" under the Policies. Covered Causes of Loss are defined as follows: "When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." Ex. A at 100; Ex. B at 128.

22

82. None of the Exclusions, limitations or limits apply to Plaintiff's loss. See Ex. A at 100-106. Ex. B at 128-134. There is no exclusion or limitation for losses caused by a pandemic.

83. The Policies contain an endorsement that excludes loss due to a virus. That provision states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Ex. A at 99; Ex. B at 127. That exclusion does not apply to Plaintiff's loss because that loss was not caused by a virus. There is no evidence that the virus has ever been in its premises. Plaintiff's loss was caused by a pandemic.

84. The Policies set forth the method to determine the Business Income loss. They state:

> The amount of Business Income loss will be determined based on:
>
> > (1) The Net Income of the business before the direct physical loss or damage occurred;
> >
> > (2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;
> >
> > (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
> >
> > (4) Other relevant sources of information, including:
> >
> > > (a) Your financial records and accounting procedures;
> > >
> > > (b) Bills, invoices and other vouchers; and
> > >
> > > (c) Deeds, liens or contracts.

Ex. A at 93; Ex. B at 121.

85. The Policies sets forth the method of determining recoverable Extra Expense. It states:

> The amount of Extra Expense will be determined based on:

23

(1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

    (a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

    (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

Ex. A at 93; Ex. B at 121.

86. Plaintiff and Class Members are entitled to coverage under the above provisions of the Policy in an amount to be determined.

**F. Defendants' Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them**

87. Defendants have taken no steps to cover their insureds for their COVID-19 related business losses. To the contrary, they tell insureds and the public that these business losses are not covered.

**1. Defendants' attempts on their websites to discourage claims**

88. CWG has a web page with its message to insureds regarding COVID-19. That page has a title that states, "CWG COVID-19 MESSAGE."[64] Here is a screenshot of the title of that page:

---

[64] https://www.cwgins.com/cwg-covid-19-message/ (accessed 7/25/2020).



89. Nowhere on this page does CWG acknowledge to its customers that their COVID-19 losses are covered by their policies. Because that is what its insureds are interested in from their insurance company, in omitting that acknowledgement CWG is attempting to convey the message that these losses are not covered.

90. Here is a screenshot of the page's first paragraph:[65]

To Our Insurance Customers and Agents:

In these unprecedented and difficult times, the COVID-19 pandemic has impacted businesses, employees, customers and communities.  We sincerely appreciate your choosing Continental Western Group®, on behalf of Continental Western Insurance Company, Union Insurance Company, Tri-State Insurance Company, Acadia Insurance Company and Firemen's Insurance Company of Washington, D.C. for your business insurance needs and we want to remain connected with you to assist with any issues or concerns you have regarding your business insurance coverage.

91. The first sentence is a recognition that what has impacted businesses, employees, customers and communities is the COVID-19 pandemic, not specifically a virus.

92. However, despite CWG's assurances that it is aware of the difficulties its insureds are having, appreciates their business, and desires to help them, nowhere in this COVID-19 message does CWG even hint that it will pay their lost-business or business-interruption claims.

---

[65] *Id.*

25

93. Instead, in the next paragraph, CWG states that it has "business continuity plans which are designed to address situations like this," but those plans have nothing to do with paying claims:[66]

Situations like this

Business continuity plans

Since the onset of the COVID-19 situation, Continental Western Group has implemented its business continuity plans which are designed to address situations like this.  As a result, Continental Western Group remains fully operational and ready to serve our customers, while most of our employees are now working remotely for their own safety and protection.  This transition has been relatively seamless and we continue to deliver the highest service and support for our customers.

94. CWG quickly makes clear that these "business continuity plans designed to address situations like this" do not assist the insureds' "business continuity" efforts by paying claims resulting from a "situation like this"; the only "plan" CWG describes has to do with avoiding cancellation by accommodating those that might have difficulty paying premiums:[67]

Avoid the cancellation

We will be happy to discuss your individual situation and we will endeavor to make reasonable accommodations when required by a specific state insurance department, or if not required, when possible to avoid the cancellation or non-renewal of your current insurance policy.

When required

95. As can be seen, CWG states that it will make "reasonable accommodations *when required by a specific state insurance department*, or if not required, *when possible* to avoid the cancellation or non-renewal of your current insurance policy."[68]

96. These "accommodations" regarding paying premiums do not address the real issue presented by a "situation like this," at least as far as insureds are concerned regarding their insurance policy, namely whether the company will cover their losses.

---

[66] *Id.*
[67] *Id.* (emphasis added).
[68] *Id.* (accessed 7/25/2020) (emphasis added).

97. On information and belief, this COVID-19 "message" was coordinated, and perhaps created, by W.R. Berkley. That belief is based on the fact that the exact same message was set forth, word-for-word and in the same formatting, on the websites of more than a dozen other Berkley units.[69] If these are truly independent companies, someone is guilty of plagiarism.

### 2. W.R. Berkley's denial of coverage in its financial statements

98. In a conference call on April 21, 2020, with seven financial analysts from Credit Suisse AG, Deutsche Bank AG, Goldman Sachs Group Inc., and other firms, W. Robert Berkley, CEO of Defendant Berkley, denied that COVID-19 business losses were covered by the company's policies.[70] He stated: "Many people are looking to the insurance industry for a solution. And unfortunately, they are looking for the solution even when the product they purchased does not provide one."[71]

99. He then went beyond that mere denial to smear plaintiff's lawyers by accusing "the plaintiff's bar" of "subscrib[ing] to the idea of never letting a crisis go to waste."[72]

100. He also accused "the plaintiff's bar" of being "unencumbered by what the words in a policy say."[73]

---

[69] *Compare* CWG's page, https://www.cwgins.com/cwg-covid-19-message/ *with* https://www.intrepiddirect.com/covid-19/; https://www.keyrisk.com/node/169; https://www.admiralins.com/covid-19-information-for-admiral-customers/; https://www.nautilusinsgroup.com/covid-19/; https://bnetportal.berkleynet.com/wps/portal/berkleynet/covid19page; https://www.peiwc.com/colorado-and-missouri-partners/; https://www.berkleypro.com/; https://www.berkleyequine.com/covid-19-resources/; https://www.berkleynpac.com/loss-control/bnp-covid-19-resources/; https://www.mecasualty.com/covid19; https://berkleyenvironmental.com/about-us/covid-19-statement/; https://www.berkley-ps.com/covid-19-information/; https://www.berkleypublicentity.com/covid19; https://usic.com/covid-19/; (all accessed 7/25/2020).
[70] Edited Transcript of Q1 2020 W.R. Berkley Corp. Earnings Call, April 21, 2020, available on Defendant Berkley's website at https://ir.berkley.com/home/default.aspx (accessed 5/29/2020) ("W.R. Berkley Conference Call").
[71] Conference Call at 4.
[72] *Id*.
[73] *Id*.

101. In an SEC filing, Defendant Berkley offered a reason why it contends that its policies do not cover COVID-19 business losses. In its most recent quarterly report, it decried "attempts to extend business interruption coverage *where there is no physical damage or loss to proper*ty."[74]

102. Defendant Berkley blatantly misquoted its policies, which do not cover "physical damage or loss to the property." As shown above, they cover "physical *loss of or* damage to property …." Ex. A at 88 (emphasis added). That is a loss that occurs because its insureds' employees have physically lost access to their property to engage in their normal business activities.

103. Moreover, despite those denials, Defendant Berkley has set aside $65 million as a "preliminary provision for COVID-19 related losses."[75] In the conference call on April 21, 2020, CEO W.R. Berkley explained that that was the company's best estimate of what it would end up paying for COVID-19 losses:

> [W]e did our best to come up with what an appropriate estimate we thought would be based on the available information at the time. … What I can promise you is, based on the available information at that moment, we did our best to estimate what we think the cost will be for this company. So no, this is not just sort of claims that had come over the transom. It is not that at all. It is our best estimate, understanding the situation and understanding our portfolio, what do we see the costs associated with the circumstance being?[76]

104. In its quarterly SEC report (where it reported that the amount of the reserve was $67 million, not $65 million), the company stated that, "because COVID-19 did not begin to affect the Company's operations and financial position until late in the first quarter of 2020, its impact on the Company's first quarter of 2020 is not necessarily indicative of its potential impact for the remainder of 2020."[77] It also stated that the impact of the pandemic "is expected to include,"

---

[74] W.R. Berkley Corporation, SEC Form 10-Q for Quarterly Period Ended March 31, 2020, at 22.
[75] https://s22.q4cdn.com/912518152/files/doc_news/W-R-Berkley-Corporation-Reports-First-Quarter-Results-2020.pdf (accessed 5/29/2020) ("2020 1Q 10-Q)").
[76] Conference Call at 10.
[77] 2020 1Q 10-Q at 30.

among other things, additional claims. It stated: "Claim Losses Related to COVID-19 May Exceed Reserves."[78]

105. Nevertheless, even though Defendant Berkley told the investment community that it had preliminarily reserved $65 million or $67 million to cover COVID-19 claims and that even that amount might not be sufficient, it has not mentioned those reserves on its web pages directed to its customers or acknowledged to them that it expects to pay *any* claims. It wants them to believe their losses and extra expenses won't be covered.

106. An insurance policy is, ultimately, simply a contract where the insured agrees to pay insurance premiums and the insurance company agrees to pay the insured, up to the policy limits, for losses covered by the policy. However, unlike most contracts, the insurer is usually not called upon to perform (since, after all, insurance protects against the unexpected). When the insurer's performance is required, it only arises when the insured is, by definition, in a desperate financial position. Once a loss occurs, an insured can no longer buy protection for that loss from competing insurers – in essence, the insurer has exclusive and complete control over the evaluation, processing and denial of that claim.

107. The implications of this disparity here is clear. Defendants' strategy is to discourage policyholders from making claims in the hope that it will never even have to face their claims, much less pay them.

### 3. Defendants' Denial of Plaintiff's claim

108. Despite that strategy, Plaintiff made a claim on its policy in or about late March for COVID-19 losses and extra expenses. This claim was denied in a letter dated May 5, 2020, addressed to Jara Wong, Plaintiff's office manager, signed by Lori Clark, SR. Claims Representative. Exhibit C

---

[78] *Id.*

109. In her letter Ms. Clark states: "During our conversation on March 26, 2020 you reported that your office locations were shut down by government order …." *Id.* This is not true. Ms. Wong never had a conversation with Ms. Clark. Ms. Clark's conversation was with Plaintiff's insurance agent.

110. Furthermore, it is not true that as of March 26, Plaintiff's locations were shut down by government order. As of that date, there was not even a Stay at Home Order in Missouri and the one in St. Louis County allowed visits to dentists.[79]

111. Ms. Clark refers to the State of Missouri's State at Home order of April 6, 2020. *Id.* However, that order did not direct dentists' offices to shut down. It allowed individuals to leave home to access health care, while practicing social distancing.

112. On information and belief, Defendants were aware that there was no order in Missouri shutting down dentists' practices. That belief is based on the fact that Defendants do business in Missouri and boasts on its website about its "local knowledge and expertise."[80] Nevertheless, Ms. Clark spends much of her letter discussing whether there is coverage under the policy's Civil Authority provision related to civil authority prohibitions of access to the insured's property. That provision is irrelevant because there was no such prohibition.[81]

113. Ms. Clark states that there is no Business Income coverage because "Business Income coverage applies only when there is direct physical damage to your premises …." Ex. B at 5. That is a blatant mischaracterization of the policy, which provides for coverage when there is direct physical "loss of" the property, not just damage to the property. As shown herein, Plaintiff experienced a loss of its property because of the COVID-19 pandemic.

---

[79] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/; https://stlouisco.com/portals/8/docs/document%20library/CountyExecutive/Executive%20Orders/Stay%20at%20Home%20Order.pdf (both accessed 5/11/2020).
[80] https://www.cwgins.com/about-cwg/ (accessed 7/25/2020).
[81] https://governor.mo.gov/priorities/stay-home-order (accessed 7/25/2020).

114. Ms. Clark also asserts that the Policy's virus exclusion bars coverage. *Id.* at 5. That provision states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Ex. A at 99. That exclusion does not apply to Plaintiff's loss because that loss was not caused by a virus. There is no evidence that the virus has ever been in its premises. Plaintiff's loss was caused by a pandemic.

115. Defendants could have employed broader causation language in the Virus Exclusion – as it does elsewhere in the Policies – and thereby excluded Plaintiffs' losses, but it did not.

116. For example, the General Exclusion provision in the Causes of Loss – Special Form states: "We will not pay for loss or damage caused directly or *indirectly* by any of the following. Such loss or damage is excluded *regardless of any other cause or event that contributes concurrently or in any sequence to the loss*." Ex. A at 100; Ex. B at 128 (emphasis added). Defendants, however, elected to use the more restrictive causation language ("caused by or resulting from") in the Virus Exclusion.

117. Nor did Defendants incorporate the Virus Exclusion into Paragraph B, the Exclusions section of the Causes of Loss – Special Form. Thus, the "directly or indirectly" or "regardless of any other cause or event that contributes" language of Paragraph B does not apply to the Virus Exclusion.

118. As a result, the Virus Exclusion does not apply if the virus causes the loss indirectly. Here, if the coronavirus has any causal relationship to Plaintiffs' losses, it is indirect.

119. Nor does the Virus Exclusion apply if there is any other cause or event that contributes concurrently or in any sequence to the loss. Here, the other causes are the pandemic, the urgings

31

of scientific and professional groups like CDC and ADA to close dental practices, and the resulting decisions of Plaintiffs and other dental practices to close.

120. Furthermore, even if the Virus Exclusion were applicable to the losses of Plaintiff and Class members, under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it.

121. Specifically, in 2006, two insurance industry trade groups, the ISO and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

122. In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

123. In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

124. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

> This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded…

125. These representations made by the insurance industry were false.

126. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

127. Upon information and belief, the state insurance departments relied on the industry's and Defendants' representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage.

128. The assertions made by the insurance industry and Defendants to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public policy concerns, Defendants should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

129. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, Defendants effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

130. Under the doctrine of regulatory estoppel, the Court should not permit Defendants to benefit from this type of duplicitous conduct before the state regulators.

131. Defendants' denial of Plaintiff's claims occurred more than thirty days ago and were vexatious and without reasonable cause or excuse, such that Plaintiffs are entitled to additional damages, along with a reasonable attorneys' fee, pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420.

## IV. CLASS ALLEGATIONS

132. Plaintiff brings this action on behalf of itself and as a representative of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following classes and subclasses:

> All persons and entities operating dental practices in Missouri with Business Income (including Extended Business Income) coverage issued by Defendants that made claims with any Defendant for suspension (*i.e.*, the partial slowdown or complete cessation of their business activities) of business related to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Business Income Coverage Class").

> All persons and entities operating dental practices in Missouri with Extra Expense coverage issued by Defendants that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and for which Defendants have denied a claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Extra Expense Coverage Class").

133. Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

134. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

135. This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

136. **Numerosity.** Fed. R. Civ. P. 23(a)(1). The members of each Class are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendants' records.

34

137. **Commonality and Predominance.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

    a. Whether Plaintiff and the Class members suffered a covered loss under the common policies issued to members of the Class;

    b. Whether Defendants wrongfully denied all claims based on COVID-19;

    c. Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

    d. Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

    e. Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

    f. Whether Plaintiff and the Class members suffered damages as a result of Defendants' actions.

138. **Typicality.** Fed. R. Civ. P. 23 (a)(3). Plaintiff's claims are typical of the claims of the Classes they seek to represent. Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

139. **Adequacy.** Fed. R. Civ. P. 23(a)(4). Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

140. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to

the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

141. **Injunctive and Declaratory Relief.** Fed. R. Civ. P. 23(b)(2). Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

142. In addition, particular issues are appropriate for certification under Fed. R. Civ. P. 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests thereon. Such particular issues include, but are not limited to:

    a. Whether the policies issued by Defendants cover Class members' business income losses and extra expenses due to the COVID-19 pandemic and public health and stay-at-home orders referred to herein;

b. Whether the coverages for Business Income losses and extra expenses provided by Defendants' policies are precluded by exclusions or other limitations in those policies;

c. Whether Defendants breached contracts by denying coverage for Business Income losses and extra expenses;

d. Whether Defendants engaged in bad faith efforts to dissuade insureds from making claims for Business Income losses and extra expenses due to the COVID-19 pandemic; and

e. Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct.

## V.  JURY DEMAND

143. Plaintiff demands a trial by jury on all claims so triable.

## COUNT I: BUSINESS INCOME BREACH OF CONTRACT
### (By Plaintiff and the Business Income Coverage Class)

144. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

145. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants under Missouri law.

146. Plaintiff's Policies and the policies of other Business Income Coverage Class Members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff for its covered losses under the Policies and for Class members' covered losses.

147. In Plaintiff's Policies, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic.

Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

148. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

149. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under Plaintiff's Policies and other Class members' policies.

150. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

151. Defendants, without justification, have refused performance under Plaintiff's Policies and other Class members' policies by denying coverage for these losses and such denials were vexatious and without reason. Accordingly, Defendants are in breach of the Policies and other Class members' policies.

152. Due to Defendants' breach of Plaintiff's Policies and other Class members' policies, Plaintiff and other members of the Business Income Coverage Class have suffered actual and substantial damages for which Defendants are liable, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420, in an amount to be proved at trial.

**COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME**
**(By Plaintiff and the Business Income Coverage Class)**

153. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

154. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants under Missouri law.

155. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Class in the following respects:

a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Class; and

l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

156. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

157. As a result of this breach, Plaintiff and the Business Income Coverage Class have been damaged in an amount to be proven at trial, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420.

**COUNT III: DECLARATORY RELIEF APPLICABLE TO BUSINESS INCOME**
**(By Plaintiff and the Business Income Coverage Class)**

158. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

159. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants under Missouri law.

160. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

161. Plaintiff's Policies and the policies of other Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

162. In the Policies, Defendants expressly agreed to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the Policies. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

163. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

164. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policies and other Class members' policies.

165. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

166. Defendants, without justification, have refused performance under the Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policies and other Class members' policies.

167. Plaintiff and the Class members seek a judicial determination of whether the Policies provide coverage for Plaintiff's and Class members' losses.

168. A case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Class members' policies.

### COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT
### (By Plaintiff and the Extra Expense Coverage Class)

169. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

170. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendants under Missouri law.

171. Plaintiff's Policies and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

172. In Plaintiff's Policies and the policies of other Extra Expense Coverage Class members, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

173. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

174. The extra expenses triggered the extra expense coverage under Plaintiff's Policies and other Class members' policies.

175. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

176. Defendants, without justification, have refused performance under the Policies and other Class members' policies by denying coverage for these losses and expenses and such denials were vexatious and without reason. Accordingly, Defendants are in breach of the Policies and other Class members' policies.

177. Due to Defendants' breach of Plaintiff's Policies and other Class member policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

**COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Extra Expense**
**(By Plaintiff and the Extra Expense Coverage Class)**

178. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

179. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendants under Missouri law.

180. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Coverage Class with respect to the Extra Expense provisions in the following respects:

a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class the benefits of their policies;

b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Class; and

l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

181. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

43

182. As a result of this breach, Plaintiff and the Extra Expense Coverage Class have been damaged in an amount to be proven at trial, including additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420.

## COUNT VI: DECLARATORY RELIEF APPLICABLE TO EXTRA EXPENSE
### (By Plaintiff and the Extra Expense Coverage Class)

183. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

184. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendants under Missouri law.

185. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

186. Plaintiff's Policies and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

187. In Plaintiff's Policies and the policies of other Extra Expense Coverage Class members, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

188. The COVID-19 pandemic has caused Plaintiff and the Extra Expense Coverage Class covered losses.

189. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff and Class members losses.

190. The extra expenses triggered the Extra Expense coverage under Plaintiff's Policies and other Class members' policies.

191. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

192. Defendants, without justification, have refused performance under Plaintiff's Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of Plaintiff's Policies and other Class members' policies.

193. Plaintiff and the Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Class members' losses.

194. An actual case or controversy exists regarding Extra Expense Coverage Class members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's Policies and other Class members' policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment against Defendants, as follows:

1. An order certifying appropriate classes and/or subclasses, designating Plaintiff as the class representative and its counsel as class counsel;

2. A judicial declaration declaring the meaning of the provisions concerning the business income coverage and extra expense coverage;

3. An award of damages to Plaintiff and the Class in an amount to be determined at trial

4. An award of additional damages pursuant to Mo. Rev. Stat. § 375.296 and Mo. Rev. Stat. § 375.420;

5. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

45

6.  An award of costs and attorneys' fees, as allowed by law; and

6.  Such other or further relief as may be appropriate.

Dated: July 31, 2020                    Respectfully submitted,

                                        **LAW OFFICE OF RICHARD S. CORNFELD, LLC**


                                        By:   _/s/ Richard S. Cornfeld_____
                                              Richard S. Cornfeld, #31046MO
                                              Daniel S. Levy, #66039MO
                                              1010 Market Street, Suite 1645
                                              St. Louis, Missouri 63101
                                              P. 314-241-5799
                                              F. 314-241-5788
                                              rcornfeld@cornfeldlegal.com
                                              dlevy@cornfeldlegal.com

                                              And

                                              Anthony S. Bruning, #30906MO
                                              Anthony S. Bruning, Jr., #60200MO
                                              Ryan L. Bruning, #62773MO
                                              THE BRUNING LAW FIRM, LLC
                                              555 Washington Avenue, Suite 600
                                              St. Louis, Missouri 63101
                                              P. 314-735-8100 / F. 314-898-3078
                                              tony@bruninglegal.com
                                              aj@bruninglegal.com
                                              ryan@bruninglegal.com

                                              And

                                              Alfredo Torrijos (*Pro Hac Vice* to be submitted)
                                              ARIAS SANGUINETTI WANG & TORRIJOS,
                                              LLP
                                              6701 Center Drive West, 14th Floor
                                              Los Angeles, CA
                                              T: (310) 844-9696
                                              F: (310) 861-0168
                                              alfredo@aswtlawyers.com

                                              ***Attorneys for Plaintiff***

46

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2020, the foregoing was filed with the Court Clerk via the Court's electronic filing system and served on upon all counsel of record via the Court's electronic notification system.



*/s/ Richard S. Cornfeld*